JAMES F. McKAY III, Judge.
JjSTATEMENT OF CASE
On August 6, 2010, the State charged the defendant, Brandon Smith, with one count of possession with intent to distribute cocaine. The defendant pled not guilty at his arraignment on August 23, 2010. Prior to trial on May 17, 2011, the State amended its charge against the defendant to one count of distribution of cocaine. The defendant pled not guilty at on that same date. On May 18, 2011, a twelve-member jury found the defendant guilty as charged. On June 10, 2011, he was sentenced to serve ten years at hard labor. Prior to imposing sentence, the court denied his motion for post-verdict judgment of acquittal and his motion for a new trial. On August 29, 2011, the trial court granted Smith’s appeal.
STATEMENT OF FACT
Detective Daniel Hunter testified that from July 28, 2010, through August 2, 2010, he conducted a narcotics investigation of the defendant, Brandon Smith, and the defendant’s twin brother, co-defendant, Jason Smith, a.k.a. “Twin,” and assisted in the arrest of both men on August 2, 2010. In conducting his investigation of the defendant and his brother, Detective Hunter set up surveillance on the property located 531 Sixth Street in New Orleans.
|2Puring his surveillance, Detective Hunter observed an unknown black male riding on a green bicycle approach and knock on the door at 531 Sixth Street. The defendant came to the door. After a brief conversation between the two, the defendant entered the house and the “unknown black male rode his bike towards the corner, the nearest corner, which was *526 St. Thomas and Sixth Street.” The unknown male waited with his bicycle at the corner. A short while later, the defendant came out of the house and met with the unknown male. The unknown male handed the defendant an unknown denomination of money. Detective Hunter testified that “he could see there was money.” The defendant then removed a small white object from his mouth and handed it to the unknown male on the bicycle. After the unknown male inspected the object, he placed it in his mouth and rode off on the bicycle. Detective Hunter testified that, in his experience as a narcotics detective, he has observed individuals place narcotics in their mouth. Detective Hunter did not stop the individual on the bike because:
When the buyers buy their narcotics[,] they place it in their mouth[s]. When we attempt to stop those buyers, they swallow their narcotics so they don’t get arrested.
Prior to witnessing the transaction between the defendant and the unknown male on a bicycle, Detective Hunter obtained a search warrant for the residence of 531 Sixth Street. The target of the warrant was “[a] subject known as Twin ... a black male, five-seven, [one hundred and sixty] pounds[,] with long dreadlocks.” After he observed the transaction between the men, Detective Hunter executed the search warrant. Detectives Hinrichs, Ger-mann, and Cox, as well as other assisting detectives, participated in executing the search warrant with Detective Hunter. However, Detective Hunter did not enter the house until “[a]fter the house was completely secured and the targets were arrested or placed in handcuffs.”
| «¡Detective Hunter described the residence as “a one-story [home] with a second story added on in the back, further back.” “[Q]uite a few people” were in the house when the search warrant was executed, including the defendant, and his brother, Jason. During the search, the officers retrieved narcotics from the home. Specifically, the narcotics were retrieved from a waste pipe that was connected to an upstairs toilet in the home. Detective Hunter followed the pipe to the point where it went into the ground, located a saw, and sawed the pipe in half at the area just before the pipe went into the ground. The pipe was not small, “it was quite large,” and it was made out of PVC (polyvinyl chloride plastic). After he cut the pipe, another detective, who was situated next to the upstairs toilet, flushed the upstairs toilet three times. “[W]ithin [thirty] seconds to [one] minute after the third flush, a clear plastic bag containing crack cocaine came out of the pipe.” Specifically, inside of the clear plastic bag were “[fifty] individually wrapped crack cocaine rocks ... another clear plastic bag inside it with three individually wrapped crack cocaine rocks[,] and another clear plastic bag with a total of six individually wrapped crack cocaine rocks totaling [fifty-nine] pieces.” After he retrieved the bag of crack cocaine from the pipe, he showed it to Detective Hinrichs, who identified it and placed it in the rear of Detective Hunter’s enforcement vehicle. Detective Hunter testified that the way in which the crack cocaine was packaged was customary for resale purposes.
After Detective Hunter retrieved the crack cocaine from the pipe, he entered and searched the residence at 531 Sixth Street. During the search, he found co-defendant, Jason Smith’s, Louisiana Identification Card, which listed 531 Sixth Street as Jason Smith’s address. In addition, Detective Hunter “located a razor blade with white residue on it, which [he] believed to be crack cocaine, as well as 14three boxes of ammunition.” All of the items were recovered “[i]n the left bed *527 room by the dresser.” This was the same bedroom Jason Smith was seen entering when he flushed the crack cocaine down the toilet. At that point, the defendant and Jason were placed under arrest. The defendant had total of eleven dollars in his pocket. Jason Smith had a total of ten dollars in his pocket.
On cross-examination, Detective Hunter conceded that his involvement in the case initially resulted from a narcotics investigation of Jason, not the defendant. However, the defendant also became a target of the investigation when Detective Hunter observed the defendant engage in what he believed to be a hand-to-hand transaction. Detective Hunter did not know what exactly the subject of that transaction was. Detective Hunter testified that he was not certain that he witnessed crack cocaine being distributed between the defendant and the unknown male. Likewise, the recipient of the transaction, the unknown male, was never stopped or arrested, nor was any evidence of the object being transferred ever obtained. In addition, Detective Hunter conceded that he only found eleven dollars on the defendant. No videos or photographs were taken of the defendant engaging in any activity.
Detective Kyle Hinrichs, a nineteen-year veteran with the New Orleans Police Department, testified that on August 2, 2010, he arrested Brandon Smith, the defendant, and Jason Smith, the defendant’s brother, at 581 Sixth Street in New Orleans. According to Detective Hinrichs’ testimony, he, Sergeant Manuel Castellón, and Detectives Jayson Germano, Troy Black, and Evan Cox assisted primary investigator, Detective Daniel Hunter, with his narcotics investigation of the defendant. Detective Hunter led the investigation, and he had a narcotics-based search warrant for the residence of 531 Sixth Street. The target of the search |swarrant “was said to go by the nickname of Twin, who was a light-skinned black male with long dreads.”
Prior to serving the search warrant, Detective Hunter had set up surveillance of the location. When Detective Hunter, Detective Hinrichs, as well as some other officers, arrived at 581 Sixth Street, and “made [a] forceful entry” into the residence by way of the front door, the officers announced themselves as police officers.
Detective Hinrichs was the first person to enter the residence. Upon entry there were approximately five or six people, including children, inside the house. Detective Hinrichs’ “main focus was on the individual with the long dreads,” a man who “matched the description of the primary target of the officers’ investigation,” and “who was later identified as Jason Smith.” When the officers entered the residence, Jason ran up the stairs to the second floor of the house. Detective Hinrichs followed Jason up the stairs and into a bedroom with a bathroom attached to the inside. Detective Hinrichs did not observe Jason in possession of anything when he chased him up the stairs. Detective Hinrichs chased Jason into the bedroom and then into the adjoining bathroom. However, he “did not have constant sight of him,” as he was still on the stairs when Jason ran into the bedroom. When Detective Hinrichs got to the bathroom, he observed Jason “throwing a clear plastic bag[] that appeared to contain cocaine, crack cocaine inside of it, in[to] the toilet and flushing the toilet.” “[I]t was obviously a clear plastic bag with white objects inside of it that were similar to crack cocaine.” For safety purposes, Detective Hinrichs ordered Jason to place his hands in the air. After the toilet was flushed without incident, Jason complied with Detective Hin-richs’ order, and Detective Hinrichs handcuffed him.
*528 | BWhile going up the stairs, Detective Hinrichs observed another individual, a man who was later identified as the defendant. The first time Detective Hinrichs saw what he thought to be cocaine was when Jason “tossed the bag into the toilet.” No one else was in the bathroom when Jason flushed the toilet, and Jason flushed the toilet only once.
After Detective Hinrichs handcuffed Jason and began escorting him out of the bathroom and bedroom areas, he saw that one of the other officers had apprehended the defendant. The defendant and Jason were both escorted down the stairs. After the defendant and Jason were arrested, the officers, including Detective Hunter, who had arrived on the scene to assist, made a “systematic search of the residence.” Detective Hinrichs did not find anything inside the residence.
The crack cocaine that Jason flushed down the toilet was eventually confiscated. Detective Hinrichs informed Detective Hunter of what he witnessed inside the residence. The officers “observed the piping of the structure from the bathroom and Detective Hunter followed that piping ... underneath [the] residence.”
Detective Hunter obtained a saw and cut the pipe. Detective Hunter directed that Detective Germann flush the toilet. Detective Germann flushed the toilet three times, and on the third flush, the bag of crack cocaine came out of the pipe. Detective Hinrichs described the bag that came out of the piping as “a clear plastic bag that contained crack cocaine similar to what [he] saw being put in the toilet.” Upon closer inspection, the bag contained [fifty] pieces of crack cocaine in the clear sandwich bag that were wrapped in clear plastic, which is common for narcotics packaging, as well as two other bags, smaller bags, one which contained six pieces of crack cocaine and the other had three, for a total of fifty-nine [pieces].
^Detective Hinrichs conducted a search incident to arrest of the defendant and found eleven dollars. In addition, Detective Hinrichs found ten dollars on Jason. Detective Hinrichs testified that “[a] dime bag is usually referred to on the street as a [ten dollar] piece of crack cocaine,” and that it is worth around ten dollars. Detective Hinrichs testified that no one else at the residence was arrested other than the defendant and Jason because “none of [the other individuals inside the residence] were observed in illegal activity or narcotics sales, [and] it was not apparent that they were aware of the crack cocaine being in the residence.” In addition, Detective Hinrichs testified that he was confident the crack cocaine confiscated from the pipe was the same crack cocaine he saw Jason with earlier that day.
On cross-examination, Detective Hin-richs testified that he did not participate in the surveillance at any point in the investigation. He did not have an opportunity to observe anything that happened prior to the time when Detective Hunter directed that he and the other officers enter the house. Detective Hinrichs did not observe the defendant engage in any hand-to-hand transactions or the like. Detective Hin-richs only observed the defendant after he entered the residence. Detective Hinrichs saw the defendant “on that platform as you get to the top of the stairs,” but he “ignored” him because he was in pursuit of Jason at the time. Detective Hinrichs did not come into contact with the defendant until he searched him. He did not detain the defendant, nor did he “initially place him under arrest.” When Detective Hin-richs searched the defendant, he found only eleven dollars. He could not remember the denominations of the currency he recovered. He did not find drugs or weap *529 ons on the defendant. No videos or photographs were taken of the evidence.
| sCo-defendant, Jason Smith, called one witness, Detective David Barnes. Detective Barnes testified that during the course of his five year employment with the NOPD, he used video cameras and cameras to take photographs when he conducted narcotics investigations involving the distribution of a certain drug.
On cross-examination, Detective Barnes testified that he did not participate in the investigation of the defendant or Jason Smith. Detective Barnes has never been assigned to the Sixth District, the district that he neither conducted the investigation of the defendant and Jason Smith, nor would he be able to testify about the Sixth District’s capabilities.
The defendant rested without calling any witnesses.
ERRORS PATENT
A review of the record reveals two patent errors: (1) the trial court did not wait twenty-four hours after denying defendant’s motion for new trial before sentencing defendant; and (2) the sentence is illegally lenient in that it did not provide that the first two years of the sentence be served “without benefit of probation, parole, or suspension of sentence,” as mandated by La. R.S. 40:967(B)(4)(b).
PATENT ERROR 1
The trial court sentenced the defendant immediately after it denied defendant’s motion for a new trial. La.C.Cr.P. art. 873 requires that the trial court wait twenty-four hours after overruling a motion for a new trial to sentence a defendant. Specifically, La.C.Cr.P. art. 873 provides: “[i]f a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled.”
| .¡Despite the fact that the court failed to abide by the twenty-four hour waiting period, prescribed by La.C.Cr.P. art. 873, the defendant did not challenge his sentence on appeal. This Court has held that when a defendant does not challenge his sentence on appeal, any failure to abide by sentencing delays pursuant to La.C.Cr.P. art. 873 is harmless error. State v. Collins, 584 So.2d 356 (La.App. 4 Cir.1991); State v. Boyd, 2008-0659 (La.App. 4 Cir. 11/12/08), 999 So.2d 40; see also, State v. White, 404 So.2d 1202, 1204 (La.1981).
PATENT ERROR 2
The defendant was found guilty of violating La. R.S. 40:967(A)(1). The trial court sentenced defendant to ten years at hard labor. The trial court’s sentence did not provide that the defendant serve the first two years of his sentence “without benefit of parole, probation, or suspension of sentence,” as required by La. R.S. 40:967(B)(4)(b).
La. R.S. 40:967(B)(4)(b) provides that any person who is convicted of distribution of cocaine:
[S]hall be sentenced to a term of imprisonment at hard labor for not less than two years nor more than thirty years, with the first two years of said sentence being without benefit of parole, probation, or suspension of sentence.
Pursuant to La. R.S. 15:301.1(A), remand is not necessary to correct the trial court’s omission of the requirement that the sentence be served “without the benefit of probation, parole, or suspension of sentence.” La. R.S. 15:301.1(A) provides:
When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit of probation, parole, or suspension of sentence, each sentence *530 which is imposed under the provisions of that statute shall be deemed to contain the Improvisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.
See also, State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790.
DISCUSSION
ASSIGNMENT OF ERROR NUMBER 1
In his sole assignment of error, the defendant argues that the evidence produced by the state was insufficient to sustain his conviction for distribution of cocaine. Specifically, the defendant argues that because no drugs were found on his person or among his belongings within his residence, he was found only to be in possession of eleven dollars when he was arrested, and no police officer had any firsthand knowledge as to the source of the money, there was not enough circumstantial evidence to support his conviction.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of evidence. State v. Mussall, 523 So.2d 1305 (La.1988). The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Ash, 97-2061, p. 4 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667.
InWhen circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. Id. Pursuant to La. R.S. 15:438, the elements of the crime must be proved so that every reasonable hypothesis of innocence is excluded. Id. This is not separate from the Jackson test. Rather, it is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant beyond a reasonable doubt. Ash, 97-2061, p. 4, 729 So.2d at 667-668.
In the present matter, the defendant was convicted of distribution of cocaine. La. R.S. 40:967(A)(1) provides that it shall be unlawful for any person “knowingly or intentionally ... [t]o ... distribute, or dispense, a controlled dangerous substance ... classified in Schedule II.” Cocaine and its derivatives are listed in Schedule II. La. R.S. 40:964. A defendant is guilty of distribution of cocaine when he transfers possession or control of cocaine to his intended recipients. State v. Smith, 97-2221 (La.App. 4 Cir. 4/7/99), 734 So.2d 826, 831. “The state must show (1) ‘delivery’ or ‘physical transfer;’ (2) guilty knowledge of the controlled dangerous substance at the time of transfer; and (3) the exact identity of the controlled dangerous substance.” Id. (quoting, State v. Miller, 587 So.2d 125, 127 (La.App. 2 Cir. 1991)).
In the present matter, the State has failed to prove all three the requirements needed in order to convict the de *531 fendant of distribution of cocaine. The State presented no evidence of what was being transferred between the defendant and an unknown male. Detective Hunter was the only witness who saw the alleged transfer of cocaine between the defendant and the unknown male. Detective Hunter admitted that he had no way of definitively knowing what exactly was | ^transferred between the defendant and the other man. Indeed, Detective Hunter made no effort to have the unknown male stopped or apprehended following the alleged transfer. As such, there was no way of definitively knowing what the defendant was giving to the other man. Because the State has failed to prove that the item the defendant allegedly transferred was a controlled dangerous substance, the State has failed to prove that the defendant is guilty of distribution of cocaine. See, State v. Smith, 97-2221 (La.App. 4 Cir. 4/7/99), 734 So.2d 826, 831.
Finally, the State has failed to provide any case law in support of its argument that the evidence was sufficient to support the defendant’s conviction.
Viewing the evidence in the light most favorable to the prosecution, it does not appear as though a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See, Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Because the State failed to prove what the defendant gave to the unknown man, the evidence did not prove beyond a reasonable doubt that the defendant distributed cocaine. See, State v. Ash, 97-2061, p. 4 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667.
CONCLUSION
Considering the foregoing, we reverse the defendant’s conviction, and vacate his sentence.
REVERSED
LOMBARD, J., dissents.